IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 3, 2023 Session

IN RE PAISLEY J. ET AL.

Appeal from the Chancery Court for Tipton County
No. 36413          William C. Cole, Chancellor

_____

No. W2022-01059-COA-R3-PT

_____

In this case involving termination of the father's parental rights to his children, the trial court found by clear and convincing evidence three statutory grounds for termination of the father's parental rights to all three of his children, and the court found by clear and convincing evidence additional putative father grounds for termination of his parental rights to his youngest child only. The trial court further determined that clear and convincing evidence established that termination of the father's parental rights was in the children's best interest. The father has appealed. Having determined that the trial court found two statutory grounds, abandonment by failure to visit and abandonment by failure to support, that were not included in the petitioners' original or amended petitions, we reverse the court's findings on these two grounds. We must also reverse the four statutory grounds applicable to a putative father inasmuch as the petitioners did not present evidence to establish that the father qualified as a putative father. We affirm the trial court's judgment in all other respects, including termination of the father's parental rights based upon the remaining ground and best interest analysis.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Jeremy T. Armstrong, Ripley, Tennessee, for the appellant, Stephen J.

Jeremy C. and Dusti C., Covington, Tennessee, Pro Se.[1]

_____

[1] Kasey A. Culbreath represented the appellees throughout the proceedings in the trial court and filed a notice informing this Court of the appellees' decision not to file an appellate brief. Ms. Culbreath informed this Court that she had recently closed her legal practice and would be unable to assist the appellees in this appeal.

# OPINION

## I. Factual and Procedural Background

On December 10, 2020, Dusti C., the mother of the subject minor children ("Mother"), and her husband, Jeremy C. ("Stepfather") (collectively, "Petitioners"), filed a "Petition for Adoption" in the Tipton County Chancery Court ("trial court"), seeking to terminate the parental rights of Stephen J. ("Father") to Paisley J., Kevin J., and Maci B. (collectively, "the Children"). Paisley was born in January 2015, Kevin in February 2016, and Maci in November 2017 during a period of Father's incarceration. Petitioners alleged that Father was incarcerated at the time of the petition's filing and had willfully abandoned the Children by failing to visit them and failing to provide them with support during the four consecutive months prior to his incarceration pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv).[2] In addition, Petitioners alleged that Father was not the legal parent or guardian of the Children at the time of the filing of the petition and that he had "failed, without good cause or excuse, to make reasonable and consistent payments for the support" of the Children pursuant to Tennessee Code Annotated § 36-1-113(g)(9)(A)(i).[3] Stepfather also sought to adopt the Children and be established as their legal father with Mother retaining her own parental rights.

Father received a service of summons concerning the termination petition on February 26, 2020, while incarcerated at West Tennessee State Penitentiary. Father filed a *pro se* response with the trial court, contesting the petition. The trial court subsequently appointed him counsel on April 15, 2021. Father then filed an amended answer on June 25, 2021, denying the alleged statutory grounds for termination and denying that termination of his parental rights would be in the Children's best interest.

On December 9, 2021, Petitioners filed an amended petition. Therein, Petitioners included the additional statutory ground of failure to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Children

---

[2] In both their original and amended petitions, Petitioners incorrectly cited to Tennessee Code Annotated § 36-1-102(1)(A)(i) although they employed language from Tennessee Code Annotated § 36-1-102(1)(A)(iv). We note that Petitioners alleged that Father was incarcerated at the time of the petition's filing and that he had failed to visit and support the Children during the four consecutive months <u>immediately preceding his incarceration,</u> rather than the four months prior to the filing of the petition. We therefore conclude that Petitioners intended to plead abandonment by an incarcerated parent pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv).

[3] We note that Petitioners averred in both their original and amended petitions that Father was the "biological and legal father" of the Children. However, in subsequent portions of their petitions, Petitioners contradicted this averment by claiming that Father was not the Children's legal father and alleging several statutory grounds applicable to a putative father.

2

pursuant to Tennessee Code Annotated § 36-1-113(g)(14). As part of that statutory ground, Petitioners further alleged that placing the Children in Father's custody would pose a risk of substantial harm to their physical or psychological welfare. Petitioners also included additional statutory grounds relevant to a putative father, alleging that Father was not the legal parent or guardian of the Children at the time of the filing of the petition and that (1) he had failed to seek reasonable visitation with the Children, pursuant to Tennessee Code Annotated § 36-1-113(g)(9)(A)(ii); (2) he had failed to manifest an ability and willingness to assume legal and physical custody of the Children, pursuant to Tennessee Code Annotated § 36-1-113(g)(9)(A)(iii); and (3) placing the Children in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Children, pursuant to Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv).

The trial court conducted a bench trial adjudicating the amended petition on June 27, 2022. During trial, Father, Mother, and Stepfather testified. Although a transcript of the trial is not included in the record, Father submitted a statement of the evidence in accordance with Tennessee Rule of Appellate Procedure 24(c). Petitioners did not object to Father's statement of the evidence.

In describing her relationship with Father, Mother testified during trial that he had been physically abusive and often used illegal drugs. She described one night during which Father had kicked down a locked door while under the influence of methamphetamine and attacked her while she held Kevin. Mother stated that Father had previously slapped, punched, and pushed her down while the Children were present in the room. Mother also testified that Kevin feared men, including his uncles and grandfather, due to Father's physical abuse of Mother. She explained that Stepfather had helped Kevin overcome these fears. Mother also stated that the Children did not know Father.

When describing Stepfather, Mother testified that he had acted as a father to the Children and that they called him "Daddy." She related that he regularly bathed them, tucked them in their beds for sleep; kissed them good morning; prepared their meals; helped them learn and read books; assisted with completing homework; and folded the Children's clothes, knowing which clothing belonged to each child. Additionally, Mother testified that Stepfather and she shared household responsibilities such as grocery shopping and "pottytraining" the Children. Mother included that Stepfather and she began their more serious relationship in February 2020 after dating periodically for more than a decade. The two married on June 27, 2020.

Stepfather testified that he regularly would help the Children dress and arrive at school. He also reported that he had transported and accompanied the Children to the doctor on previous occasions and had attended their parent-teacher conferences. According to Stepfather, he could care for the Children financially without assistance.

3

Petitioners also produced evidence of Father's criminal history. The evidence included an exhibit reflecting Father's Tennessee Bureau of Investigation ("TBI") criminal record, evincing numerous criminal charges filed against Father since 2015. The TBI document did not clearly show which criminal charges resulted in criminal convictions. However, Father testified regarding his criminal history, revealing that he had received a two-year sentence of incarceration in October 2017 after being convicted of vandalism. He also stated that he was convicted of possession of a controlled substance in May 2017 and criminal trespass, aggravated burglary, driving on a suspended license, and driving an unregistered vehicle in July 2017. He further testified that he had been sentenced to probation in federal court for a "high-speed flight from an immigration checkpoint in New Mexico in June 2018 or 2019" in a stolen Jeep. Father additionally stated that he had been convicted of aggravated burglary in December 2019 and, as a consequence, received a three-year sentence of incarceration. According to Father, he was released from prison in June 2021.

During trial, there was considerable testimony regarding Father's potential possession of firearms in violation of the conditions of his probation and his possible gang affiliation. Father testified that he had posted videos of himself with a semi-automatic rifle, which he maintained was a pellet gun, to his Facebook page sometime between June and December 2021. Father reported that he had been reincarcerated on January 12, 2022, due to his violation of the conditions of his probation as a result of his presence near a firearm on December 8, 2021. According to Father, he suffered a gunshot wound on December 8, 2021, but he invoked his Fifth Amendment right against self-incrimination under the United States Constitution when asked whether he shot himself or if he had possessed the firearm in question. He pled guilty to violating his probation on March 24, 2022, and a United States district court sentenced him to eight months of incarceration.

Father testified that while incarcerated, he had maintained regular access to a contraband cellular telephone for a period between November 2020 and May 2021. He had used the cell phone to contact Mother and post pictures to his Facebook page. Petitioners introduced an exhibit containing text messages between Mother and Father that had taken place on March 31, 2021, via Facebook. In that conversation, Father offered to voluntarily relinquish his parental rights for $500.00. Father claimed that the offer had been made by the owner of a borrowed phone after Father had forgotten to sign out of his Facebook account and had returned the phone to its owner.

Upon his release from incarceration in June 2021, Father testified that he resided with his grandmother. Per his testimony, Father did not pursue employment because he was on house arrest and relied on his grandmother to provide him with housing, utilities,

4

and money. Father admitted that he used funds from his grandmother to illegally purchase drugs, including marijuana, Percocet, and ecstasy.

Mother testified that Father previously had sent messages requesting to be a part of the Children's lives but that most of their associated conversations centered around her and "who she was with." She articulated that she had refused to permit Father contact with the Children because he was violent, dangerous, and used illegal drugs. Father countered that he had offered support and resources for the benefit of the Children. However, Mother explained that Father had not offered to provide financial support for the Children since 2018.

The trial court entered an order terminating Father's parental rights on July 7, 2022. The court ascribed great weight to Petitioners' respective testimonies, finding them both to be "very credible witnesses." Specifically, the court credited Mother's testimony that Father had neither visited nor offered financial support for the Children in recent years. Although Mother had deliberately kept the Children away from Father, the court determined that her actions were justified inasmuch as she may have become subject to a Tennessee Department of Children's Services ("DCS") investigation had she failed to protect the Children from Father's actions and behaviors.

In evaluating Father's testimony, the trial court determined that Father had failed to provide or adequately quantify statements pertaining to proof of financial support or offers of financial support. Additionally, the court noted that Father had failed to provide the Children with any form of non-monetary support such as birthday or Christmas gifts.

The trial court further found that Father did not maintain a meaningful relationship with the Children. He had not seen Paisley, who was seven at the time of trial, since she was approximately three years old. Additionally, Father had only held Kevin approximately twice and had neither met nor had any contact with Maci. The court also found that Father had never filed a petition requesting visitation with the Children or a petition establishing his paternity of Maci. Neither parent filed a petition to set child support.

Ultimately, the trial court determined that Petitioners had presented clear and convincing evidence that (1) Father abandoned the Children by failing to visit them for four consecutive months prior to the filing of the amended petition, (2) Father abandoned the Children by failing to support them for four consecutive months prior to the filing of the amended petition, and (3) Father failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.

Additionally, the trial court found by clear and convincing evidence that Father was not Maci's legal parent or guardian at the time of the filing of the petition and that Petitioners had proven four additional statutory grounds applicable to a putative father. Specifically, the court found by clear and convincing evidence that Father (1) had failed to make reasonable and consistent payments for the support of Maci in accordance with the child support guidelines, (2) had failed to seek reasonable visitation with her, (3) had failed to manifest an ability and willingness to assume legal and physical custody of her, and (4) that placing her in Father's legal and physical custody would pose a risk of substantial harm to her physical or psychological welfare. Lastly, the court determined by clear and convincing evidence that termination of Father's parental rights was in the best interest of the Children. Father timely appealed.

## II. Issues Presented

Father presents the following issues for this Court's review, which we have restated slightly as follows:

1. Whether the trial court erred by finding that Petitioners presented clear and convincing evidence to support the statutory ground of abandonment by failure to support the Children.

2. Whether the trial court erred by finding that Petitioners presented clear and convincing evidence to support the statutory ground of abandonment by failure to visit the Children.

3. Whether the trial court erred by finding that Petitioners presented clear and convincing evidence to support the statutory ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.

4. Whether the trial court erred by finding clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a

6

presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182

7

S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Sufficiency of the Record on Appeal

At the outset, we note that without a transcript of the trial adjudicating Father's parental rights, "it is necessary that we address the sufficiency of the record presented so we may determine whether we are able to come to a conclusion on the underlying issues based on the record presented." *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at \*3 (Tenn. Ct. App. Jan. 24, 2018). It is well settled that "in cases involving the termination of parental rights, a record of the proceeding of sufficient completeness to permit proper appellate consideration of the parent's claims must be made in order to preserve that parent's right to an effective appeal." *In re Adoption of J.D.W.*, No. M2000-00151-COA-R3-CV, 2000 WL 1156628 at \*4 (Tenn. Ct. App. Aug. 16, 2000). As this Court explained in *In re Adoption of J.D.W.*, the United States Supreme Court has held that "a parent's interest in defending against a state's action in terminating parental rights require[s] a record complete enough to allow fair appellate consideration of the parent's claims." *Id.* at \*3 (citing *M.L.B. v. S.L.J.*, 519 U.S. 102, 121-22 (1996)). If the trial court has determined that the parent is indigent, the court must "ensure there is a record of trial evidence that is sufficiently complete to allow an appellate court to review the evidence in accordance with applicable standards, even when the petition to terminate parental rights is filed by a private party." *In re Austin C.*, No. M2013-02147-COA-R3-PT, 2014 WL 4261178, at \*4 (Tenn. Ct. App. Aug. 27, 2014) (citing *In re Adoption of J.D.W.*, 2000 WL 1156628, at \*4 n.5); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 116 n.8 (1996) (explaining that state action is invoked when a private party asks the state to terminate a parental relationship).

Regarding whether an appellate record missing a verbatim transcript of the termination proceeding may constitute a record sufficiently complete for appellate consideration, this Court has previously explained:

> [W]e noted in *L.D.N.* that "a parental rights termination case where a Statement of the Evidence would be sufficient would be extremely rare." *L.D.N. v. R.B.W.*, [No. E2005-02057-COA-R3-PT,] 2006 WL 369275, at *5 [Tenn. Ct. App. Feb. 17, 2006]. However, no Tennessee court has held that an evidentiary record that is based solely on a statement of the evidence would automatically constitute an insufficient record. *Id.* More specific to the evidence in this record, our courts have not held that an evidentiary record that is based, in part, on a statement of the evidence is automatically insufficient. To the contrary, our courts have "stopped just short of holding that a Statement of the Evidence never will be sufficient for proper appellate review in a parental rights termination case and that a transcript always must be provided." *Id.* Nevertheless, the best way to proceed in a termination of parental rights case is by providing the appellate court with a complete transcript of all evidence. *Id.*
>
> What is required in appeals of parental termination cases is *an evidentiary record of sufficient completeness* to permit proper appellate review of the parent's claims. *See In re J.M.C.H.*, [No. M2002-01097-COA-R3-JV,] 2002 WL 31662347, at *4 [Tenn. Ct. App. Nov. 26, 2002]; *see also In re Adoption of J.D.W.*, 2000 WL 1156628, at *3-4.

*In re Austin C.*, 2014 WL 4261178, at *4-5.

In the record before us, Father has submitted a statement of the evidence summarizing trial testimony from Father, Mother, and Stepfather. This includes a summary of the testimony during the direct examination, cross-examination, and redirect examination of each witness, and sufficient detail of the testimony has been provided. In addition, Petitioners have not contested the accuracy or completeness of the statement of the evidence. We therefore conclude that the statement of the evidence filed in this case constitutes one of those rare submissions that is sufficient to enable us to proceed to analyze the substantive issues on appeal. Nevertheless, despite our conclusion regarding the sufficiency of the statement of the evidence in this appeal, we reiterate and emphasize that "the best way to proceed in a termination of parental rights case is by providing the appellate court with a complete transcript of all evidence." *Id.* at *4.

9

V.  Statutory Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2022) lists the statutory requirements for termination of parental rights, providing in relevant part:

>  (a)   The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
>  * * *
>
>  (c)   Termination of parental or guardianship rights must be based upon:
>
>  > (1)   A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>  >
>  > (2)   That termination of the parent's or guardian's rights is in the best interests of the child.

In its final judgment, the trial court determined that clear and convincing evidence supported the following grounds for termination:  (1) abandonment by failure to visit, pursuant to Tennessee Code Annotated § 36-1-113(g)(1) and § 36-1-102(1)(A)(i); (2) abandonment by failure to support, pursuant to Tennessee Code Annotated § 36-1-113(g)(1) and § 36-1-102(1)(A)(i); (3) four grounds applicable to a putative father, pursuant to Tennessee Code Annotated § 36-1-113(9)(A)(i)-(iv), with respect to Maci; and (4) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children, pursuant to Tennessee Code Annotated § 36-1-113(g)(14).  We will address each statutory ground in turn.  *See In re Carrington H.*, 483 S.W.3d at 525-26 (instructing that this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal").

A.  Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2022) provides as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

    (1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tennessee Code Annotated § 36-1-102(1)(A) (Supp. 2022) provides the following definitions of abandonment as pertinent here:

For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i)     For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

    * * *

(iv)     A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

    (a)     Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the

11

child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration[.]

We first recognize that there is a discrepancy between the abandonment grounds alleged by Petitioners and the abandonment grounds found by the trial court. In their original petition, Petitioners alleged that Father was then currently incarcerated and that he had abandoned the Children by failing to visit and failing to support them during the four months immediately preceding his incarceration. In their amended petition, Petitioners noted that Father had since been released from incarceration, but they again alleged abandonment by failure to visit and failure to support during the four-month period preceding his incarceration. Petitioners did not provide the start date of Father's incarceration in either petition. Further confusing matters, Petitioners cited to Tennessee Code Annotated § 36-1-102(1)(A)(i), rather than Tennessee Code Annotated § 36-1-102(1)(A)(iv), the statutory section applicable to abandonment by an incarcerated parent. Although they referenced the wrong statutory provision, it is apparent that Petitioners intended to allege abandonment by an incarcerated parent pursuant to § 36-1-102(1)(A)(iv) based on their factual averments and their use of language from subsection (1)(A)(iv). Nevertheless, the trial court found clear and convincing evidence that Father had abandoned the Children by failure to visit and failure to support during the four months immediately preceding the filing of the amended petition, pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(i), statutory grounds not sufficiently pled in either the original or amended petition.

This Court has previously emphasized:

> [Courts must] "strictly apply the procedural requirements in cases involving the termination of parental rights." *Weidman v. Chambers*, No. M2007-02106-COA-R3-PT, 2008 WL 2331037, at *6 (Tenn. Ct. App. June 3, 2008) (citing *In re W.B. IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618 at *10 (Tenn. Ct. App. Apr. 29, 2005) and *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004)). And a fundamental component of due process is proper notice of the issues to be tried in the court. *In re W.B. IV*, 2005 WL 1021618, at *13. So unless a ground for termination is tried by implied consent, *see In re Alysia S.*, 460 S.W.3d 536, 564 (Tenn. Ct. App. 2014), parental rights may be terminated "only upon the statutory ground(s) alleged in the petition because otherwise the parent would be 'disadvantage[d] in preparing a defense.'" *In re Anthony R.*, No. M2012-01412-COA-R3-PT, 2013 WL 500829, at *4 (Tenn. Ct. App. Feb. 8, 2013) (quoting *In re W.B. IV*, 2005 WL 1021618, at *10).

*In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *9 (Tenn. Ct. App. Mar. 8, 2023) (quoting *In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *11 (Tenn. Ct. App. Nov. 10, 2021)).

In a similar case to the one at bar, this Court has previously stated:

Here, the original petition alleged only "abandonment" of the Children. When pressed for more specificity, Petitioners amended the petition, for a second time, to allege abandonment by failure to visit or support *in the four months immediately preceding the filing of the petition*. Although the proof at trial revealed that Petitioners were well aware of Mother's repeated periods of incarceration, abandonment by an incarcerated parent was not specifically alleged in the pleadings. Mother argues that the petition failed to provide her with adequate notice of the particular grounds for termination she was called upon to defend. In a case involving the same two forms of abandonment, we have held a petition to be deficient where the "wrong" four-month statutory period is pleaded. *See In re K.N.B.*, No. E2014-00191-COA-R3-PT, 2014 WL 4908505, at *13 (Tenn. Ct. App. E.S., filed Sep. 30, 2014).

*In re D.H.B.*, No. E2014-00063-COA-R3-PT, 2015 WL 1870303, at *5 (Tenn. Ct. App. Apr. 23, 2015) (emphasis in original).

In the present case, Petitioners pled abandonment by an incarcerated parent in both their original and amended petitions. However, the trial court found that Petitioners had proven the statutory grounds of general abandonment pursuant to § 36-1-102(1)(A)(i). Given that Petitioners did not allege that Father had failed to visit or support the Children during the four months preceding the filing of their amended petition but rather the four months preceding Father's unspecified incarceration date, we cannot conclude that Father had sufficient notice to defend against the four-month period prior to the filing of the amended petition. *See In re Anthony R.*, No. M2012-01412-COA-R3-PT, 2013 WL 500829, at *4 (Tenn. Ct. App. Feb. 8, 2013) ("[A] court may terminate a parent's rights to his child based only upon the statutory ground(s) alleged in the petition because otherwise the parent would be 'disadvantage[d] in preparing a defense.'") (quoting *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *10 (Tenn. Ct. App. Apr. 29, 2005)).

Further complicating this issue, Petitioners also failed to aver the start date of Father's incarceration in either their original petition or amended petition. By the time of trial, Father had been incarcerated multiple times. It is undisputed that he was incarcerated at the time of the original petition's filing. The record, however, did not establish whether Father had been incarcerated or in the hospital due to his gunshot wound when the amended

13

petition was filed. In fact, Petitioners asserted in their amended petition that Father had been released from prison and that his whereabouts were unknown. Without an averment of the date upon which Father was incarcerated or a specific averment of the four-month determinative period at issue, Father did not have proper notice of the ground alleged. Accordingly, we conclude that the trial court erred by using the four months preceding the amended petition as the determinative period when evaluating the statutory grounds for abandonment. However, we must now determine whether general abandonment pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(i) was tried by implied consent. *See In re D.H.B.*, 2015 WL 1870303, at *5 ("Since the petition, as amended, did not allege the relevant time period of 'the four . . . consecutive months immediately preceding . . . incarceration,' we next consider whether the ground of abandonment by failure to support, as applicable to an incarcerated parent, was tried by implied consent.").

When evaluating whether an unpled statutory ground for termination has been tried by implied consent "it must be clear from the record that any 'evidence presented that is relevant to the unpled ground had <u>no relevance to any other issue being presented to the Trial Court</u>.'" *In re Disnie P.*, 2023 WL 2396557, at *9 (quoting *In re Lauren F.*, 2021 WL 5234712, at *11) (emphasis added). In this action, it is evident that testimony regarding Father's failure to visit and failure to support during the period of August to December 2021, the four months immediately preceding the filing of the amended petition, was also relevant to the ground of failure to manifest an ability and willingness, the grounds relating to a putative father, and the analysis of the best interest factors. *See id.* ("It is clear that whether Father and Mother failed to support the Child *was* relevant to the ground of failure to manifest an ability and willingness and the analysis of the best interest factors."). For example, evidence of Father's failure to provide financial support to the Children, failure to seek employment, and purchase and use of illegal drugs following his June 2021 release was relevant to both the unpled abandonment ground for failure to support and whether he manifested an ability and willingness to assume financial responsibility for the Children. In addition, testimony from the parties relating to Father's absence, including his own statement that he did not file a petition to establish visitation, is relevant to both abandonment by failure to visit and his ability and willingness to assume custody. Therefore, we are unable to conclude that the unpled abandonment grounds were tried by implied consent. Ergo, we reverse the trial court's finding of abandonment by failure to visit and abandonment by failure to support pursuant to § 36-1-102(1)(A)(i).

B. Failure to Manifest an Ability and Willingness to
Assume Custody of or Financial Responsibility for the Children

The trial court found clear and convincing evidence that Father had failed to manifest an ability and willingness to assume legal and physical custody of or financial

14

responsibility for the Children. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (Supp. 2022) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, Petitioners were required to show by clear and convincing evidence that (1) Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Children and (2) returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

### 1. Failure to Manifest Either an Ability or Willingness

Ability and willingness are distinct concepts. "If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d at 677 (emphasis in original). "Ability focuses on the parent's lifestyle and circumstances." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018); *see also In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) ("Mother failed to manifest an ability to personally assume legal and physical custody of the children because she was living an itinerant lifestyle, residing with friends or in her car, at the time DCS filed the termination petition.").

With respect to willingness, this Court has previously elucidated: "Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019). Furthermore, "we look for more than mere words," *id.*, and "we have previously held that evidence was sufficient to meet this ground when it showed that the parent voluntarily chose to live a lifestyle lacking stability." *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (citing *In re Morgan K.*, No. M2018-00040-COA-R3-PT, 2018 WL 5733291, at *13 (Tenn. Ct. App. Oct. 31, 2018)). Many of the same facts relevant to a parent's willingness apply to our analysis of a parent's

ability inasmuch as both of these concepts may relate to a parent's "lifestyle." *Id.*; *In re Jonathan M.*, 2018 WL 5310750, at \*5.

In the case at bar, the trial court made the following findings of fact pertinent to this statutory ground: (1) Father never filed a petition to establish visitation; (2) Father had not offered financial support for the Children since approximately 2017;[4] (3) Father did not testify that he had provided any other forms of non-monetary support, such as birthday/Christmas gifts, cards, etc.; (4) Father had been in and out of jail since the birth of the youngest child, Maci; (5) upon his release from prison in June 2021, Father resided with his grandmother, who afforded him financial support; (6) Father never offered to support the Children with the funds received from his grandmother; (7) within a few weeks of his release, Father returned to illegal drug use, namely the abuse of Percocet, ecstasy, and marijuana; (8) Father engaged in criminal conduct and self-destructive behaviors, including illegal use of firearms and drugs; (9) Father had not had contact with the Children since 2017[5] and did not have a meaningful relationship with them at the time of trial; (10) Stepfather had been actively involved in the Children's lives since early 2020, demonstrated devotion to their care, and developed a close relationship with them; and (11) Father was "arrested on a federal warrant for violation of his federal probation on January 12, 2022" and pled guilty to this violation on March 24, 2022, consequently serving a prison sentence until September 2022, after which he would be required to enter a long-term drug treatment program for three to six months. Based upon these findings, the trial court determined that Petitioners had established by clear and convincing evidence this statutory ground for termination. We agree.

With respect to Father's willingness, the record supports that Father's lifestyle was unstable, particularly considering his failure to seek or maintain employment. During trial, Father acknowledged that he did not pursue employment upon his June 2021 release from prison.[6] Father did not clarify when he last sought employment or if he had ever obtained employment. Father explained that he did not seek employment because he desired to "get house arrest and community service out of the way." Furthermore, Mother testified that in

---

[4] We note that, according to the statement of the evidence, Mother testified that Father had not offered to provide financial support for the Children since 2018, not 2017.

[5] In our review of the record, we have been unable to locate testimony, as summarized in the statement of the evidence, that reflects that Father had not seen the Children since the year 2017 specifically. However, there is abundant testimony demonstrating that Father had not been actively involved in the Children's lives for several years. For instance, Father acknowledged during trial that he had not been involved in the Children's lives "since they were babies."

[6] A November 2021 Facebook message from Father to Mother was admitted as an exhibit during trial. Although Father claimed therein that he had been working full time, his testimony during trial did not corroborate this statement.

16

her estimation, Father had been unable to maintain long-term employment due to his uncooperative and disrespectful behavior. Father explained that he depended on his grandmother for financial support following his June 2021 release from prison. However, instead of utilizing this financial support to contribute to the needs of the Children or pay the fines related to his criminal sentences, Father used funds given to him by his grandmother for the purchase of illegal drugs, cigarettes, and "vape."

Moreover, Father was incarcerated at the time of trial and had been frequently incarcerated for much of the Children's lives. In October 2017, only one month after Maci was born, Father was sentenced to two years in prison. Father explained that he was periodically incarcerated from December 2019 until June 2021. Upon his June 2021 release from prison, Father continued to exhibit an unwillingness to abstain from illegal activities. He used illegal drugs and handled or was around firearms in violation of the conditions of his probation. He did not state that he had ever attempted to overcome these obstacles by attending drug rehabilitation. From the time of his June 2021 release to the filing of the amended petition, Father had approximately six months to make efforts to address his illegal drug use, obtain employment, and refrain from violating the law. However, the evidence indicates that Father made no such efforts. In fact, he violated the conditions of his probation the day before Petitioners filed the amended petition. We therefore agree with the trial court that Father did not demonstrate a willingness to assume custody of or financial responsibility for the Children.

Concerning his ability, Father's lifestyle likewise rendered him unable to achieve custody of the Children. There was no indication predicated upon his testimony that Father was employed and able to financially support the Children or provide them with a drug-free, stable home. As previously reviewed, according to testimony of both Mother and Father, Father consistently used illegal drugs, rendering him unsuitable to parent the Children. Per Father's admission, his only recent sustained period of sobriety was during his incarceration. Furthermore, Father had routinely been incarcerated since 2017. Father was unable to achieve custody of the Children by virtue of his incarceration, which was not set to end until September 2022. Father testified that upon his September 2022 release from prison, he would enter an inpatient drug rehabilitation program for three to six months. Thus, Father would be unable to provide and care for the Children while incarcerated or attending a residential rehabilitation program.

Because Father demonstrated a lifestyle fraught with financial instability, persistent illegal drug use, cycles of incarceration, and repeated criminal activity, this Court agrees with the trial court that Petitioners proved by clear and convincing evidence that Father failed to manifest an ability and willingness to assume custody of or financial responsibility for the Children.

17

## 2. Risk of Substantial Harm

In support of this statutory ground, Petitioners were also required to prove that returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *See In re Neveah M.*, 614 S.W.3d at 677. This Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *8 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

In evaluating this second prong, this Court has previously placed great emphasis on facts revealing illegal drug use and instability. *See In re Jeremiah B.*, No. E2022-00833-COA-R3-PT, 2023 WL 2198864, at *11 (Tenn. Ct. App. Feb. 24, 2023) ("removing the Child from the stability of his foster home would contribute to the risk of substantial harm to his welfare"); *In re Anari E.*, No. M2020-01051-COA-R3-PT, 2021 WL 1828500, at *17 (Tenn. Ct. App. May 7, 2021) ("Given Father's unabashed drug use, as well as his continual failure to achieve stability, an unacceptable risk of harm would inhere were the Children returned to Father's care."); *In re Antonio J.*, 2019 WL 6312951, at *10 ("Stability, as this Court has often recognized, is an 'extremely important' necessity for children.").

Placing the Children in Father's custody would almost certainly expose them to illegal drug use and other criminal or unsafe activities. As previously addressed, Father engaged in criminal activity up until the day before the filing of the amended petition when he violated the conditions of his probation by possessing or being in the presence of firearms. There is no indication in the record predicated upon the evidence presented during trial that these issues had been resolved. *See In re Bralynn A.*, No. M2021-01188-COA-R3-PT, 2022 WL 2826850, at *9 (Tenn. Ct. App. July 20, 2022) ("Here, the proof shows that Mother continues to use illegal drugs and drive without a license, creating a likelihood that she will incur additional criminal charges. These issues have been held to create a risk of substantial harm for purposes of this ground for termination.").

18

Furthermore, the Children have developed a strong bond with Stepfather, whom they refer to as "Daddy." Stepfather has provided the Children with a safe and stable domestic environment by ensuring they have necessities, such as food, shelter, and clothing, and by assisting in their education. Moreover, Stepfather has been actively involved in the Children's lives. Stepfather has also helped Kevin overcome his fear of men derived from Father's abuse of Mother. In contrast to Stepfather's stability and presence, Father reported that he had not been in the Children's lives since they were infants. With respect to Paisley, Father testified that he had not been present in her life since she was three years old. He also admitted that visitation with the Children may be confusing for them, confirming Mother's testimony that they do not know Father. Thus, placing the Children in Father's custody would be tantamount to placing them in the custody of a "near-stranger." *See In re Elijah H.*, No. M2020-01548-COA-R3-PT, 2021 WL 4593844, at \*12 (Tenn. Ct. App. Oct. 6, 2021) ("This Court has previously determined that removing a child who has 'bonded and thrived' with his current family and placing a child in the custody of a near-stranger would amount to substantial harm.") (citing *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*17 (Tenn. Ct. App. July 22, 2020)).

We therefore affirm the trial court's determination that clear and convincing evidence established that Father failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children and that returning the Children to his custody would pose a risk of substantial harm to their welfare.

### C. Statutory Grounds Applicable to a Putative Father

The trial court also terminated Father's parental rights to Maci based upon four statutory grounds applicable to a putative father. Petitioners asserted these four grounds, pertaining to all the Children, in the amended petition. Tennessee Code Annotated § 36-1-113(g)(9) (Supp. 2022) provides in pertinent part:

    (A)    The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

        (i)    The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

> (ii)    The person has failed to seek reasonable visitation with
>          the child, and if visitation has been granted, has failed
>          to visit altogether, or has engaged in only token
>          visitation, as defined in § 36-1-102;
>
> (iii)   The person has failed to manifest an ability and
>          willingness to assume legal and physical custody of the
>          child;
>
> (iv)    Placing custody of the child in the person's legal and
>          physical custody would pose a risk of substantial harm
>          to the physical or psychological welfare of the child[.]

Although Father did not challenge these grounds in his appellate brief, we recognize that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *See In re Carrington H.*, 483 S.W.3d at 525-26.

As a threshold matter in reviewing the trial court's application of these statutory grounds, we must determine whether Father was a putative father at the time of the amended petition's filing. *See* Tenn. Code Ann. § 36-1-113(g)(9); *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *6 (Tenn. Ct. App. June 6, 2017). Tennessee Code Annotated 36-1-102(44) (Supp. 2022) defines a putative father as

> a biological or alleged biological father of a child who, at the time of the
> filing of the petition to terminate the parental rights of such person, or if no
> such petition is filed, at the time of the filing of a petition to adopt a child,
> meets at least one (1) of the criteria set out in § 36-1-117(c), has not been
> excluded by DNA testing as described in § 24-7-112 establishing that he is
> not the child's biological father or that another man is the child's biological
> father, and is not a legal parent[.]

The version of Tennessee Code Annotated § 36-1-117(c) (2021) in effect at the time of the termination petition's filing provided in relevant part:[7]

---

[7] Effective May 11, 2023, the General Assembly has amended Tennessee Code Annotated § 36-1-117(c) to delete subsection (3) related to a father's name appearing on a birth certificate. *See* Tenn. Pub. Acts, Ch. 393, § 2 (H.B. 854). However, because both the original and amended termination petitions in this case were filed prior to the effective date of the amendment, the prior version of the statute is applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

The parental rights of the putative father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:

(1) The biological father of a child has filed with the putative father registry, pursuant to § 36-2-318, as described in § 36-1-113(d)(3)(A), a statement of an intent to claim paternity of the child at any time prior to or within thirty (30) days after the child's birth and has notified the registry of all address changes;

(2) The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed childplacing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child; provided, that if the biological father has previously notified the department of the biological father's claim to paternity of the child pursuant to the putative father registry, § 36-2-318(e)(3), the biological father shall be subject to all the requirements for waiver of notice provisions of § 36-2-318(f)(2) and to all requirements for filing a paternity petition;

(3) The biological father is recorded on the child's birth certificate as the father of the child;

(4) The biological father is openly living with the child at the time the adoption proceeding is commenced and is holding himself out as the father of the child; provided, that if custody of the child has been removed from the biological mother by court order, notice shall be given to any man who was openly living with the child at time of the initiation of the custody or guardianship proceeding that resulted in the removal of the custody or guardianship of the child from the biological mother or biological father, if the man held himself out to be the father of the child at the time of the removal; or

(5) The biological father has entered a permanency plan under title 37, chapter 2, part 4, or under similar provisions of any other state or

territory in which the biological father acknowledges paternity of the child.

In its final order, the trial court found that Father was "the natural and legal father [of] Paisley [J.] and Kevin [J.]" but that Father was not Maci's legal father, stating: "[Father] is the natural father of the minor child Maci [B.], but was incarcerated at the time of the minor child's birth and is therefore not listed on the child's birth certificate. Paternity, while not formally established, is not disputed." Despite the court's finding, we have been unable to locate any birth certificate in the record, and there does not appear to be any testimony concerning whether Father was listed on Maci's birth certificate. Although Father may have been imprisoned during Maci's birth, this fact alone does not demonstrate that Father was not the legal parent of Maci. There is simply no evidence in the record relevant to Father's potential status as a putative father. A putative father is someone who (1) "meets at least one (1) of the criteria set out in § 36-1-117(c)," (2) "has not been excluded by DNA testing as described in § 24-7-112 establishing that he is not the child's biological father or that another man is the child's biological father," and (3) "is not a legal parent." Tenn. Code Ann. § 36-1-102(44). Petitioners failed to present evidence related to any of these requirements of a putative father and even averred in their petitions that Father was the "biological and legal father" to all three children. We therefore reverse the court's findings concerning the statutory grounds applicable to a putative father.

VI. Best Interest of the Children

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.") (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

As a preliminary matter, we address the version of the statutory best interest factors applicable to this action. When Petitioners filed their original petition, the respective best interest statute featured a nine-factor test. In April 2021, approximately eight months

before Petitioners filed their amended petition, the statutory best interest factors were expanded to include twenty factors.  In analyzing the best interest of the Children, the trial court utilized the new twenty factors.  Father did not raise an objection to the trial court's application of the twenty statutory factors, and no issue has been presented to this effect on appeal.  *See* Tenn. Code Ann. § 36-1-113(i) (Supp. 2022).  In holding that the amended statutory best interest factors should be considered when a termination petition has been filed on or after the effective date of the amendment, this Court has explained, "the statute as amended adds a number of 'additional factors that should be considered, if relevant.'"  *In re Alessa H.*, No. M2021-01403-COA-R3-PT, 2022 WL 3332653, at *14 (Tenn. Ct. App. Aug. 12, 2022) (quoting *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *14 n.10 (Tenn. Ct. App. Jan. 14, 2022)).

Whether the amended version of the statute is applicable here depends upon whether the amended petition was a "'separate and distinct petition'" from the original.  *See In re Ava M.*, No. E2019-01675-COA-R3-PT, 2020 WL 2560932, at *14 (Tenn. Ct. App. May 20, 2020) (quoting *In re P.G.*, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at *7 (Tenn. Ct. App. Aug. 17, 2018)).  This Court has recently determined that an amended petition was separate and distinct from the original when petitioners "added statutory grounds for termination that were not included in the original petition."  *In re Leah T.*, No. M2022-00839-COA-R3-PT, 2023 WL 4131460, at *13 (Tenn. Ct. App. June 22, 2023); *see also In re Piper N.*, No. W2021-01185-COA-R3-PT, 2023 WL 334656, at *8 (Tenn. Ct. App. Jan. 20, 2023) (concluding that "the amended petition is separate and distinct from the original petition in that the first complaint contained no grounds for the termination of Mother's parental rights").  This Court has also recently determined that "the statutes in effect at the time the second amended petition was filed" must be applied when no statutory grounds for termination were included in the original petition and the first amended petition, although including statutory grounds, contained critical errors in the naming of the parents and child, ultimately corrected only in the second amended petition.  *In Re Disnie P.*, 2023 WL 2396557, at *4.

In their amended petition, Petitioners raised multiple additional statutory grounds for termination.  Thus, the applicable best interest factors were those contained in the amended version of the statute, rather than the prior version applicable at the time of the original petition's filing.  *See In re Leah T.*, 2023 WL 4131460, at *13.

Tennessee Code Annotated § 36-1-113(i)(1) (Supp. 2022) lists the following factors for consideration:

> (A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

23

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)      Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)      Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)      Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)      Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)      Whether the parent has ever provided safe and stable care for the child or any other child;

(P)      Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)      Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)      Whether the physical environment of the parent's home is healthy and safe for the child;

(S)      Whether the parent has consistently provided more than token financial support for the child; and

(T)      Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

25

As our Supreme Court has instructed regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re

26

Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court weighed all but five of the twenty best interest factors in favor of terminating Father's parental rights. The court did not state whether it had weighed factors (B), (F), (I), (L), and (N) in favor of or against termination of Father's parental rights. Following our thorough review of the evidence in this matter, we conclude that clear and convincing evidence supported the court's finding that termination of Father's parental rights was in the Children's best interest.

Factors (A), (C), and (J), are related by reason of their emphasis on the Children's stability and safety. The trial court correctly weighed these factors in favor of termination. With respect to factor (A), terminating Father's rights would not negatively impact the Children's stability. Based on the Petitioners' testimony, the Children are currently residing in a stable home. Father has failed to show any improvement regarding his legal and drug abuse issues. At the time of trial, Father was completing a prison sentence with a three- to six-month drug rehabilitation program to follow. Considering that Father had neither been present in the Children's lives for many years nor would be for the foreseeable future, we agree this factor weighs in favor of termination. Concerning factor (C), there is no evidence Father ever contributed to the Children's needs. Mother testified that when Father and she were in a relationship, her mother would wire her funds for food, diapers, and formula. Also, according to Mother's testimony, Father attacked her while she was holding Kevin, evincing a disregard for the Children's safety needs. Regarding factor (J), Father had often been involved in criminal activity and the use of illegal and unprescribed drugs with no sign of improvement. As previously mentioned, he violated the conditions of his probation one day prior to the filing of the amended petition and was consequently incarcerated. He was sentenced to multi-year prison sentences in 2017 and 2019. Father admitted that he used marijuana, ecstasy, and unprescribed Percocet between June and December of 2021. Mother also testified that he had used drugs throughout their relationship, including methamphetamine. We therefore find that these factors weigh in favor of terminating Father's parental rights.

With respect to factor (R), concerning the physical environment of the parent's home, Father was incarcerated at the time of trial. There was no evidence that Father ever

maintained a safe environment for the Children. Even when he was not incarcerated and was residing with his grandmother, Father used illicit drugs and illegally handled firearms. We agree with the trial court that this factor weighs in favor of termination.

The trial court did not weigh factor (B) in favor of or against terminating Father's parental rights. However, given that the court found that Father lacked a close relationship with the Children in contrast to their relationship with Stepfather, it is likely that a change of caretakers to someone they do not know would negatively impact the Children's emotional and psychological condition. As noted in a previous section of this Opinion, "removing a child who has 'bonded and thrived' with his current family and placing a child in the custody of a near-stranger would amount to substantial harm." *See In re Elijah H.*, 2021 WL 4593844, at *12 (citing *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020)). We therefore determine that this factor should have been weighed in favor of terminating Father's parental rights.

Factors (D), (E), (H), and (I) are related due to their emphasis on parental attachments and relationships. Relative to (D), the trial court stated that it "specifically finds that this factor is not possible." The court appropriately weighed this factor in favor of termination. According to Mother, none of the Children knew who Father was in relation to them. Moreover, Mother related that Father physically abused her in front of the Children, even to the extent that Kevin feared men thereafter. There was no evidence of a secure and healthy parental attachment between the Children and Father. Relevant to factor (E), the trial court found that "[Father] does not have a meaningful relationship with the [Children]." Father acknowledged that he had been out of the Children's lives since they were infants.

Father argues that the only reason that he did not visit the Children was because Mother prevented him from doing so. Father's contention is unavailing. In considering whether a mother had willfully abandoned her child, this Court explained that "[r]egardless of the circumstances, a parent whose rights are subject to termination must make every reasonable effort to visit his or her child." *In re Madison J.*, No. M2019-01188-COA-R3-PT, 2020 WL 4279791, at *9 (Tenn. Ct. App. July 24, 2020). The General Assembly has provided willfulness as an affirmative defense for the statutory termination ground of abandonment, but willfulness is not mentioned regarding the best interest factors. *See* Tenn. Code Ann. §§ 36-1-102(1)(A), -113(i)(1). Because the grounds were not properly pled, we have not addressed Father's willfulness with respect to abandonment in analyzing those statutory grounds. However, Father posits throughout his appellate brief, including the section concerning the best interest factors, that Mother's actions compel this Court to find in his favor because his failure to visit was not willful.

28

In addressing Father's argument, we find *In re Ne'Khiya M.*, No. W2019-02223-COA-R3-PT, 2020 WL 4150994 (Tenn. Ct. App. July 20, 2020), to be instructive. In *Ne'Khiya M.*, the mother similarly avoided the child's father, preventing him from visiting the child. *Id.* at *1. The father had visited the mother's last known address several times. *Id.* The father had also utilized Facebook to reach out to the mother's family members and had made multiple posts imploring others to convince the mother to let him see his child. *Id.* at *6. Due to his lack of success, the father turned to the courts and filed a petition to establish parentage and visitation. *Id.* at *5. This Court found that the father's failure to visit the child was not willful due to the mother's interference and the father's "pursuit of a judicial remedy to establish a visitation schedule and child support obligation." *Id.* at *7. Likewise, in *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007), our High Court reversed the termination of the mother's and the father's parental rights, finding that they had not willfully failed to visit the child given the "enmity between the parties" and the fact that the parents had redirected "their efforts at maintaining a parent-child relationship to the courts."

In the present action, enmity clearly existed between Mother and Father, and Mother admitted that she had prohibited Father from visiting the Children. Nevertheless, Father testified that he never filed a petition to establish a visitation schedule, citing his distrust of the court system. Although Mother's interference may have contributed to the lack of a meaningful relationship between Father and the Children, we emphasize that Father was incarcerated for much of these Children's lives. Based upon our careful review of the record, we conclude that the absence of a meaningful parent-child relationship present in this case is primarily due to Father's persistent illegal drug use, physical abuse of Mother, repeated criminal activity, and repeated incarceration. We therefore conclude that the trial court correctly weighed this factor in favor of terminating Father's parental rights.

Concerning factor (H), the trial court found that "[Stepfather] is devoted to the care of the [Children], and has developed a close relationship with them." Mother indicated that the Children call Stepfather "Daddy." Father acknowledged that visitation with the Children may be confusing to them given they do not know him. We agree with the trial court that this factor weighs in favor of termination. The trial court properly did not weigh factor (I) in favor or against Father given the dearth of evidence related to whether the Children may have had emotionally significant relationships with persons other than the parents and caregivers.

Factors (F) and (G) relate to the Children's previous experiences in the parent's home and any trauma resulting from those experiences. Relevant to factor (F), the record evinces that although the Children did not know Father, there was no specific testimony that the Children feared living in his home. The trial court did not weigh factor (F) in favor of or against termination. However, with respect to factor (G), the trial court found that

29

Kevin had "exhibited emotional troubles, specifically with other men" due to Father's physical abuse of Mother. Mother opined that visitation with Father would have a negative impact on Kevin. Therefore, the trial court correctly weighed factor (G) in favor of termination of parental rights.

Factors (K) and (L) both concern services and assistance offered to Father. With respect to factor (K), Father did not indicate during trial that he had ever voluntarily attended a drug rehabilitation program. He testified that following his June 2021 release, he had failed a drug screen and was subsequently ordered to attend rehabilitation. However, no details were presented regarding the dates or whether he even attended this rehabilitation program. In a text conversation that Mother introduced as a trial exhibit, Father stated, "I'm going to parenting classes [Tuesday through Thursday]." However, Father did not testify about these classes during trial. Father asserts in his appellate brief that he was scheduled to attend rehabilitation after his September 2022 release. However, the rehabilitation program was court ordered. The record provides no indication that when Father had the opportunity while out of prison, he had "taken advantage" of any resources despite his admitted drug addiction. We find that the trial court correctly weighed factor (K) in favor of terminating Father's parental rights. Factor (L) is inapplicable by reason that DCS is not involved in this case.

Factors (M), (P), and (Q) all relate to Father's actions to meet the Children's needs. We agree with the trial court's determination that all three of these factors weigh in favor of terminating Father's parental rights. With respect to factor (M), the trial court found that Father never filed petitions to set child support, establish paternity, or schedule visitation with the Children. Father testified that he did not file a petition to establish a visitation schedule or to set child support even after counsel was appointed to him. Due to Father's repeated criminal charges, incarceration, and illegal drug use, we agree that Father has not demonstrated a sense of urgency in addressing the circumstance, conduct, or conditions that make an award of custody unsafe and contrary to the best interest of the Children.

Regarding factor (P), we reiterate that Father had not been involved in the Children's lives for several years due to his criminal activity and repeated incarceration. In addition, Mother testified that she had fulfilled the majority of parenting responsibilities when Father was present in the Children's lives. Father noted during trial that he did not know each child's favorite foods, favorite books, or bedtime. He admitted that he had been "out of their lives since they were babies." We therefore agree with the trial court that Father did not have an understanding of the Children's basic or specific needs.

With respect to factor (Q), we consider that Father had been incarcerated throughout much of the Children's lives. Father conceded during trial that having a father who is

30

repeatedly incarcerated would not be beneficial to the Children. When he was released from prison in June 2021, he resided in the home of his grandmother, where he continued to purchase and use illegal drugs. Therefore, even when Father was not incarcerated, we cannot conclude that he "demonstrated the ability and commitment to creating and maintaining a home" that would meet the Children's needs. The trial court correctly determined that this factor weighed in favor of terminating Father's rights.

The evidence also supports the trial court's finding that factor (O) weighed in favor of terminating Father's parental rights. Mother testified that during her relationship with Father, she accomplished the majority of the parenting responsibilities and that, as previously stated, her mother would transfer to her funds for food, diapers, and formula. In addition, Father had demonstrated that he lived a dangerous life rife with illegal drugs and criminal activity.

With respect to factor (S), the trial court found that "[Father] has not offered financial support for the [Children] since approximately 2017." The court also noted that "[Father] offered no testimony of any other forms of non-monetary support, such as sending the [C]hildren birthday/Christmas gifts, cards, etc." Father advanced the position that he had made offers to financially contribute to the Children's needs but that Mother would not accept these offers and that she would periodically block Father on Facebook. Mother, on the other hand, testified that Father had not offered to provide financial support to the Children since 2018. The court found Mother to be a "very credible" witness and apparently credited Mother's testimony over Father's. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary"). We therefore affirm the court's weighing of this factor.

The trial court correctly weighed factor (T) in favor of terminating Father's parental rights. Father's continuous illegal drug use would certainly have a negative impact on his mental state and ability to provide care and supervision of the Children. *See In re Destyni S.*, No. M2022-00910-COA-R3-PT, 2023 WL 4074805, at *30 (affirming the trial court's finding that factor (T) weighed against maintaining the mother's parental rights because she failed to provide recent negative drug screens to counter her history of substance abuse). In addition, the court appeared to credit Mother's testimony that Father was not mentally stable.

Although the trial court determined that factor (N) did not weigh against Father, Mother's testimony opposes this finding. Mother reported that Father had physically abused her in the presence of the Children. Additionally, the court found that Kevin had "emotional troubles," apparently due to Father's abuse. We therefore determine that evidence of this factor weighs in favor of terminating Father's parental rights.

31

In sum, we conclude that the evidence established that eighteen of the twenty statutory best interest factors weigh in favor of terminating Father's parental rights to the Children. No factors weighed in favor of maintaining his parental rights. We therefore affirm the trial court's determination by clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

## VII. Conclusion

For the foregoing reasons, we reverse the trial court's findings regarding the statutory grounds of abandonment, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i), and statutory grounds applicable to a putative father, pursuant to Tennessee Code Annotated § 36-1-113(g)(9)(A)(i)-(iv). We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights to the Children. Costs on appeal are assessed to the appellant, Stephen J.


s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE